OLYMPUS MANAGED HEALTH CARE, INC. &
OLYMPIC HEALTHCARE SOLUTIONS, INC.,

    Plaintiffs,

    v.

AMERICAN HOUSECALL PHYSICIANS, INC. &
JONATHAN MCGUIRE,

    Defendants,

and

_____

AMERICAN HOUSECALL PHYSICIANS, INC.
F/K/A/ INROOMMD, INC.,

    Third-Party Plaintiff and
    Counterclaimant,

    v.

RONALD A. DAVIS AND STEVEN W.
JACOBSON,

    Third-Party Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

                     **ORDER**

**THIS MATTER** comes before the Court on four motions for summary judgment, all

filed on December 6, 2011. (Doc. Nos. 106; 108; 109; 110). Plaintiff Olympus Managed Health

Care, Inc. ("OMHC") filed a Motion for Summary Judgment on its breach of contract claim.

(Doc. No. 108). Plaintiff Olympus Healthcare Solutions, Inc. ("OHCS") also joined with

OMHC (together, "Olympus") in a joint Motion for Partial Summary Judgment on Defendant

American Housecall Physicians, Inc.'s ("AHP") counterclaims. (Doc. No. 109). AHP filed a

cross motion for summary judgment on its counterclaim that Olympus breached the Merger Agreement and on Olympus's claim for breach of the promissory notes. (Doc. No. 110).

On December 23, 2008, AHP filed a third party complaint against Ronald Davis ("Davis") and Steven Jacobson ("S. Jacobson"). Davis and Jacobson filed a joint Motion for Summary Judgment on AHP's claims on December 6, 2011. (Doc. No. 106). Olympus, Davis, and S. Jacobson share counsel and filed a single brief in support of their three motions for summary judgment. (Doc. No. 107).

## I.    BACKGROUND

AHP is a corporation organized under the laws of the State of Nevada with its principal place of business in Charlotte, Mecklenburg County, North Carolina. AHP is in the business of providing in-room and in-home medical services through doctor networks across the United States. Andrew Jacobson ("A. Jacobson"), the brother of S. Jacobson, is the President of AHP. (Doc. No. 107-1 at 3). OMHC is a corporation organized under the laws of the State of Delaware, with its principal place of business in Miami, Dade County, Florida. OHCS, the parent company of OMHC, is a corporation organized under the laws of the State of Delaware, with its principal place of business in Miami, Dade County, Florida. OMHC and OHCS are in the business of providing third party administrator services for insurance companies located outside of the United States related to the management of their insureds' medical claims for medical treatment in the United States. Third-Party Defendant Davis, the Chief Financial Officer of OMHC and OHCS, is a resident of the State of Florida. Third-Party Defendant S. Jacobson, the President and Chief Executive Officer of OMHC and OHCS, is a resident of the State of Florida. Davis and S. Jacobson are the sole shareholders of OMHC and OHCS and are the only members on the Board of Directors of OMHC and OHCS.

On January 1, 2006, Olympus and AHP entered into a Memorandum of Understanding concerning the companies working together and entering into a business relationship to combine the companies' resources.  On August 15, 2006, Olympus and AHP entered into a written Distribution Agreement whereby AHP agreed to allow Olympus to act as an exclusive distributor for its housecall physician network program to foreign insurance companies.  (Doc. No. 107-9 at 11).  After entering into the Distribution Agreement, S. Jacobson was elected to the Board of Directors of AHP on January 26, 2007.

At this time, AHP needed cash to cover its operating expenses.  (Doc. No. 107-7 at 26).  Olympus loaned AHP $160,000 to cover these costs.  (Id. at 25).  Olympus and AHP memorialized AHP's obligation to repay this amount through five $32,000 dollar promissory notes.  (Id.; Doc. No. 1-1).  These notes provided that AHP would pay 15% interest, a 10% late fee if payment was not made within fifteen days of the due date, and any attorneys' fees necessary to collect the amount owed.  (Doc. No. 1-1).  One note became due and payable in full each month beginning in August 2007, and ending with the fifth and final note being due in December 2007.  (Id. at 9).  It is undisputed that AHP never made any principal or interest payments to Olympus on these notes.  (Doc. 107-7 at 26).

In April 2007, Olympus and AHP began to consider a merger of the two companies.  Numerous meetings and communications took place in Charlotte, North Carolina regarding the merger.  Although S. Jacobson was a member of AHP's board at this time, he recused himself from any board discussions or votes pertaining to the transactions between AHP and Olympus due to his position with Olympus.  (Doc. No. 107-5).  On August 31, 2007, the companies executed a letter of intent (the "LOI") to pursue a merger of the two companies.  The LOI expressly provided that it "does not constitute a binding agreement" and was "[s]ubject to the

negotiation of definitive agreements meeting with approval of the parties." (Doc. No. 107-17 at 1). Following the execution of the LOI, Olympus and AHP entered into a Services Agreement on September 10, 2007 that divided the responsibilities of the companies and formulated how they would operate in contemplation of the completion of the merger. (Doc. No. 107-18).

The parties then negotiated and drafted a stock swap merger agreement (the "Merger Agreement") that provided for a swap of stock between AHP and OMHC. On January 31, 2008, AHP's counsel wrote Olympus's counsel stating, "I understand that the parties have reached agreement and would like to proceed to closing." (Doc. No. 107-20). AHP's counsel recognized, though, that AHP had no yet received "OMHC's final comments on the draft agreements." (Id.). Negotiations continued over the course of the year. (Doc. Nos. 107-22; 107-23; 107-24; 107-25; 107-26).

In August 2008, the closing appeared imminent. Olympus's counsel had Davis and S. Jacobson execute signature pages for the Merger Agreement on August 27, 2008 for counsel to hold in escrow. (Doc. No. 107-35). Counsel believed there was a chance the closing could occur sometime around the Labor Day holiday and had these signature pages executed "in case we start losing people and cannot close for lack of signatures." (Id.). AHP's counsel hoped to close on August 29. (Doc. No. 107-36 at 1). On August 29, however, AHP's counsel told Olympus's counsel that Olympus would have to waive certain commissions, grant AHP shareholders an ownership interest in a company called Assent, owned by S. Jacobson and Davis, and that other agreements had to be terminated before closing could occur. (Doc. No. 107-37). Olympus's counsel responded that AHP's desire for an ownership interest in Assent was a "deal breaker for Olympus." (Id.). The parties cleared this hurdle and continued to press toward a formal closing.

On September 15, 2008, Olympus's counsel asked AHP's counsel whether he had signature pages for his clients "held in escrow, such that as soon as everyone is signed off on the docs we can actually close?" (Doc. No. 107-40 at 1). AHP's counsel replied that he had collected most of the signatures required, but expected that he would not have them all until later in the week. (Id.). On September 18, 2008, Olympus's counsel sent AHP's counsel a redlined version of a revised Merger Agreement. (Doc. No. 107-41). Olympus's counsel was careful to remind AHP's counsel that "in the interest of time, these documents are being circulated to all parties simultaneously and remain subject to final sign off by both parties. . . . Once both AHP and Olympus are signed off, you and I can exchange signature pages." (Id.). The next day, Friday, September 19, 2008, AHP's counsel sent executed signature pages to Olympus's counsel, but only because AHP's counsel customarily closed their office early on Fridays. (Doc. No. 107-42). AHP's counsel stressed that he was sending Olympus's counsel the documents "to be held in ESCROW pending approval by all parties." (Id.). On September 22, 2008, Olympus's counsel responded that she received the signature pages. She asked AHP's counsel for employment agreements, "which [she understood] is a condition precedent to closing." (Doc. No. 107-43).

The next day Olympus's counsel informed AHP's counsel that Olympus planned to "close the deal on Tuesday, September 30, in Charlotte." (Doc. No. 107-44). Olympus's counsel further stated that she would "date all the documents accordingly and you and I can exchange all docs before you leave so that Tuesday just consists of an email releasing everything from escrow. Sound good?" (Id.). AHP's counsel responded "Sounds good." (Doc. No. 107-45). AHP's counsel then sent Olympus's counsel AHP Board Member Miles Busby's resignation on September 23, "to be effective as of closing." (Doc. No. 107-46). As of

5

September 29, there were no material terms that remained unnegotiated between the parties. (Doc. No. 112-3 at 47). Then came a wrench in Olympus's plan to merge with AHP via a stock swap.

During this time, Olympus was engaged in arbitration with a disgruntled former shareholder, Occitan Investments Ltd. ("Occitan"). On September 29, 2008, the day before the planned closing between AHP and Olympus, Occitan's counsel moved the arbitration panel for an order requiring Olympus to place OHCS's stock in escrow. (Doc. No. 107-49 at 4). Olympus feared that continuing forward with their planned stock swap with AHP might make the merger susceptible to being set aside by the Occitan Arbitration Panel. Thus, Olympus postponed the closing. Olympus then proposed alternative ways that the merger might take place, but AHP did not agree to any of these arrangements.

AHP and Olympus's relationship soured from there. AHP threatened litigation. (Doc. No. 107-51). On October 28, 2008, Olympus sent a letter to AHP indicating that Olympus no longer desired to merge with AHP. (Doc. No. 107-52). Olympus terminated the non-binding LOI and the Services Agreement, but noted that the parties remained bound by the Distribution Agreement. (Id.). Olympus also notified AHP that the full principal on all five Notes was past due and gave AHP fifteen days to pay before imposing the late fee. (Id. at 2). S. Jacobson resigned from AHP's board on October 28, 2008. (Doc. Nos. 5 at 18; 21 at 3).

AHP sent Olympus a letter, dated October 23, 2008, purporting to terminate the Distribution Agreement under Section 11.2 "for Cause." (Doc. No. 107-53). That section read that "[AHP] shall have the right to terminate this Agreement if [Olympus] fails to perform new client sales objectives and does not cure the breach within six months." (Doc. No. 107-9 at 8). There is no indication that AHP ever notified Olympus of any alleged failure to meet client sales

objectives.

Olympus replied that it had always exceeded new client sales objectives and that AHP had no right to terminate the Distribution Agreement. (Doc. No. 107-54). Soon after, Olympus learned that AHP was marketing its services to a competitor of Olympus. Olympus wrote AHP on November 7, 2008, for assurances that AHP would cease such marketing and cut off talks with the competitor as such activities violated section 9.2 of the Distribution Agreement. (Doc. No. 107-55). AHP did not respond, but instead directed Olympus to communicate only with AHP's new trial counsel. (Doc. No. 107-56). Olympus then wrote AHP on November 24, to inform AHP that Olympus was terminating the Distribution Agreement under section 11.4 for AHP's material breach of the agreement. (Doc. No. 107-1 at 50).

That same day, Olympus filed the present action against AHP and Jonathan McGuire ("McGuire"). (Doc. No. 1). Olympus claimed that AHP: (1) defaulted on the five promissory notes and was delinquent in paying $160,000 in principal, $16,000 in late fees, plus interest and attorney's fees; (2) misappropriated Olympus's trade secrets in violation of N.C. GEN. STAT. § 66-152 et seq.; (3) converted Olympus's intellectual and other property; (4) & (5) illegally accessed Olympus's computer system in violation of 18 U.S.C. § 1030 et seq. and N.C. GEN. STAT. § 14-453 et seq.; (6) breached the parties' Services Agreement's confidentiality provisions; (7) breached the parties' contract to provide services in connection with the Aetna project; (8) tortiously interfered with Olympus's contract with McGuire regarding the Aetna project; (9) conspired with McGuire to commit one or more illegal acts; (10) engaged in unfair and deceptive trade practices in violation of N.C. GEN. STAT. § 75-1.1; (11) breached the parties' Distribution Agreement by failing to pay certain commissions to Olympus. (Doc. No. 1 at 12-21). Olympus also requested an accounting to determine any other sums due to Olympus under

7

the Distribution Agreement.  (Id. at 21).

AHP responded on December 23, 2008.  (Doc. No. 5).  AHP added counterclaims and allegations against third party defendants S. Jacobson and Davis.  (Id.).  AHP alleged that: (1) S. Jacobson breached his fiduciary duties as a member of the AHP board; (2) Olympus breached the Distribution Agreement, LOI and a Non-Disclosure Agreement ("NDA"); (3) OMHC tortiously interfered with AHP's Distribution Agreement with OHCS and prospective economic advantage; (4) Olympus breached the covenant of good faith and fair dealing implied in the LOI, NDA, and Merger Agreement; (5) Olympus misappropriated AHP's trade secrets in violation of N.C. GEN. STAT. § 66-152 et seq.; (6) Olympus, S. Jacobson, and Davis engaged in unfair and deceptive trade practices in violation of N.C. GEN. STAT. § 75-1.1; (7) Olympus, S. Jacobson, and Davis affirmatively defrauded AHP; (8) S. Jacobson constructively defrauded AHP; (9) Olympus, S. Jacobson, and Davis conspired against AHP to commit one or more illegal acts; (10) Olympus, S. Jacobson, and Davis have been unjustly enriched in their use of AHP's goodwill, financial information, and intangible assets; (11) Olympus has committed trademark infringement and unfair competition; (12) AHP is the rightful owner of certain computer software; and (13) Olympus has improperly used AHP's trademarks.  (Doc. No. 5-1 at 4-17).

Olympus voluntarily dismissed their claims against McGuire on April 13, 2011.  (Doc. No. 78).  On December 6, 2011, OMHC filed a Motion for Summary Judgment on its claim that AHP defaulted on the five promissory notes and now owes Olympus $160,000 in principal, $16,000 in late fees, plus interest and attorney's fees.  (Doc. No. 108).  Olympus, S. Jacobson, and Davis filed Motions for Summary Judgment on all thirteen of AHP's counterclaims.  (Doc. Nos. 106; 109).  AHP filed a cross motion for summary judgment on its counterclaim that Olympus breached the Merger Agreement and on Olympus's claim for breach of the promissory

notes.  (Doc. No. 110).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A fact is material only if it might affect the outcome of the suit under governing

law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The

nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."

Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of

allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.   The

nonmoving party must present sufficient evidence from which "a reasonable jury could return a

verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v.

Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any

inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477

U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658, 2677 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

### III.    ANALYSIS

#### A.    Breach of Promissory Notes

Olympus loaned AHP $160,000.  (Doc. No. 1-1).  AHP's obligation to repay this amount was memorialized in five $32,000 dollar promissory notes.  (<u>Id.</u>).  These notes provided that AHP would pay 15% interest, a 10% late fee if payment was not made within fifteen days of the due date, and any attorneys' fees necessary to collect the amount owed.  (Doc. No. 1-1).  One note became due and payable in full each month beginning in August 2007, and ending with the fifth and final note being due in December 2007.  (<u>Id.</u> at 9).

On October 28, 2008, Olympus notified AHP that the full principal on all five Notes was past due and gave AHP fifteen days to pay before imposing the late fee.  (Doc. No. 107-52 at 2).  It is undisputed that AHP never made any principal or interest payments to Olympus on these notes.  (Doc. 107-7 at 26).

AHP instead argues that its obligation to repay this amount was extinguished in the Merger Agreement.  (Doc. No. 117 at 22).  The Merger Agreement provided that the promissory notes were "to be converted at or prior to the Closing, along with stock certificates in the name of [Olympus] representing shares of [AHP] Stock equal to the number of shares convertible into [AHP] Stock from the indebtedness."  (Doc. No. 74-1 at 28-29).  AHP argues that Olympus executed the Merger Agreement and thus extinguished AHP's indebtedness.  (Doc. Nos. 111 at 24; 117 at 22-23).  AHP acknowledges that this argument is "inextricably intertwined with the Court's analysis regarding breach of the Merger Agreement."  (Doc. No. 117 at 22-23).  As explained below, the Court finds that the Merger Agreement never became a binding contract.

Therefore, AHP's defense to Olympus's claim on the five promissory notes fails. Olympus is entitled to summary judgment on its claim for $160,000 in principal, $16,000 in late fees, plus interest and attorney's fees. Olympus's Motion for Summary Judgment, (Doc. No. 108), is **GRANTED** with respect to its claim for $160,000 in principal, $16,000 in late fees, plus interest and attorney's fees. AHP's Motion for Summary Judgment, (Doc. No. 110), is **DENIED** with respect to this claim. No final judgment shall issue at this time pursuant to Federal Rule of Civil Procedure 54(b) (ordinarily judgment should not issue where the Court disposes of fewer than all claims in an action).

B.      Merger Agreement

AHP contends that the events detailed above reveal a complete and binding contract to merge AHP and Olympus. No reasonable jury could agree. Thus, there is no genuine issue of material fact on this issue. Anderson, 477 U.S. at 248.

The parties agree that Delaware law governs the question of whether the Merger Agreement ever came into force. (Doc. Nos. 111 at 9; 107 at 26). AHP relies heavily on Loppert v. Windsworth, Inc., 865 A.2d 1282 (Del. Ch. 2004). (Doc. No. 111 at 9-1). Under Loppert courts look to the parties' overt manifestations of assent rather than subjective intent to determine whether a contract was formed. Id. at 1285. The court further held that:

> Whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations. . . .
>
> Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed.

11

Id. at 1285, 1287.  AHP argues that Olympus's overt manifestations indicated assent to be bound by the Merger Agreement and that Olympus never expressed its intent not to be bound until a formal closing.  (Doc. No. 111 at 10-11).  To the contrary, Olympus made this intention clear at every step of the negotiation.

The LOI expressly provided that it "does not constitute a binding agreement" and was "[s]ubject to the negotiation of definitive agreements meeting with approval of the parties." (Doc. No. 107-17 at 1).  This constitutes a positive agreement not to be bound until definitive agreements were approved by all parties.  Further, the draft of the Merger Agreement itself made clear Olympus's intention not to be bound until a formal closing occurred.  (Doc. No. 116-1 at 3, 7, 16, 19).  The Merger Agreement explicitly provided for a closing at which the transaction would be executed.  Id. at 4.  The agreement then repeated a similar qualification three times as it laid out its operative paragraphs: "assuming the due authorization, execution and delivery hereof by [Olympus and AHP], are, or will be, the valid and binding obligation of each [AHP stockholder]."  (Id. at 16); see also (Id. at 7 & 19).  While both Olympus and AHP exchanged executed copies as closing approached, their counsel understood that this exchange did not constitute the formal closing and that the signatures were to be held in escrow until closing. (Doc. Nos. 107-41; 107-42).

While Loppert involved a contract to settle a lawsuit, the Delaware Chancery court explained "the typical course of negotiating a significant commercial transaction" in Leeds v. First Allied Conn. Corp:

> Especially when large deals are concluded among corporations and individuals of
> substance, the usual sequence of events is not that of offer and acceptance; on the
> contrary, the businessmen who originally conduct the negotiations, often will
> consciously refrain from ever making a binding offer, realizing as they do that a

large deal tends to be complex and that its terms have to be formulated by lawyers before it can be permitted to become a legally enforceable transaction. Thus the original negotiators will merely attempt to ascertain whether they see eye to eye concerning those aspects of the deal which seem to be most important from a business point of view. Once they do, or think they do, the negotiation is then turned over to the lawyers, usually with instructions to produce a document which all participants will be willing to sign. . . .

After a number of drafts have been exchanged and discussed, the lawyers may finally come up with a draft which meets the approval of all of them, and of their clients. It is only then that the parties will proceed to the actual formation of the contract, and often this will be done by way of a formal 'closing' ... or in any event by simultaneous execution or delivery in the course of a more or less ceremonial meeting, of the document or documents prepared by the lawyers.

521 A.2d 1095, 1102 n.4 (Del. Ch. 1986).

This is exactly what the parties contemplated here. The LOI explicitly avoided creating a binding obligation and made the deal subject to the formation of formal documents. (Doc. No. 107-17 at 1). Those documents, in turn, required a formal closing. (Doc. No. 116-1 at 3, 7, 16, 19). The parties' counsel agreed to the form this closing would take and that it would not occur until September 30. (Doc. Nos. 107-44; 107-45). Olympus called the deal off on September 29.

Olympus points to other compelling evidence of the parties' intent. (Doc. No. 116 at 17). The Securities and Exchange Commission requires companies to file a notice when offering securities for sale. The form of the parties' intended merger required them to file such a notice within fifteen days of being "irrevocably contractually committed to invest" in each other's companies. (Doc. No. 116-4 at 6). The parties agreed to file this notice within fifteen days of closing. (Doc. Nos. 116-5 at 6; 116-6 at 6). Thus, the parties believed that they would be "irrevocably contractually committed" only upon closing.

AHP complains that "no one told Andrew Jacobson that AHP and OMHC were not, in fact, merged" before the scheduled closing. (Doc. No. 111 at 4). If it was incumbent upon

anyone to explain this fact to A. Jacobson, it would have been his own attorney, who certainly recognized it to be true. (Doc. No. 107-42). A reasonable negotiator would not have assumed the deal was done until the closing had occurred. AHP's Motion for Partial Summary Judgment, (Doc. No. 110), is **DENIED**.

C.    AHP's Counterclaims

Olympus, S. Jacobson, and Davis purport to move for summary judgment on all of AHP's counterclaims. However, they did not address AHP's tenth and twelfth claims for unjust enrichment and to quiet title to a software program. (Doc. No. 5-1 at 14, 15). Therefore, these claims survive. The Court deals with each of AHP's ten other counterclaims separately below.

1.    S. Jacobson's Breach of Fiduciary Duty

S. Jacobson moves for summary judgment on AHP's "First Claim for Relief," (Doc. No. 5-1 at 4), for breach of fiduciary duty. (Doc. No. 107 at 33). As a member of AHP's board of directors, S. Jacobson owed AHP a fiduciary duty. See Ehrenhaus v. Baker, 717 S.E.2d 9, 25 (N.C. Ct. App. 2011); N.C. GEN. STAT. § 55-8-30. S. Jacobson argues that he did not breach his duty because he did not access AHP's alleged confidential information through his position on the board, but through his position with Olympus and Olympus's Distribution Agreement with AHP. (Doc. No. 107 at 34). S. Jacobson further argues that any competition he engaged in was through Olympus and allowed under the Distribution Agreement. (Id.).

AHP argues that S. Jacobson violated his fiduciary duty by causing Olympus to walk away from a merger with AHP due to his own self-interest. (Doc. No. 117 at 41). AHP points the Court to a passage of S. Jacobson's deposition in which he admits that his diminished personal stake in the potentially merged company was his "biggest concern" and what drove his decision making. (Doc. No. 112-5 at 62). The North Carolina Court of Appeals has held that

14

"[i]t is a director's duty to administer the trust assumed by them, not for their own profit, but for the mutual benefit of all interested parties. . . . A director, in the discharge of his duties as a director, may not serve two masters; his utmost duty is to the corporation to which he is entrusted, and to no other." <u>Benchmark Carolina Aggregates, Inc. v. Martin Marietta Materials, Inc.</u>, 125 N.C. App. 666, 670 (1997).

AHP does not, however, allege that S. Jacobson breached this duty "in the discharge of his duties as a director." (<u>Id.</u>); (Doc. No. 117 at 40-42). S. Jacobson recused himself from AHP Board meetings concerning the merger. (Doc. No. 107-5). AHP alleges that S. Jacobson breached his duty to AHP while acting through Olympus, not AHP. (Doc. No. 117 at 41). In <u>Benchmark</u>, directors were alleged to have used their votes on the board to prevent an examination of a contract beneficial to another company, with which the accused directors were affiliated. 125 N.C. App. at 670. Here, by contrast, AHP alleges that S. Jacobson breached his duty to AHP when he "caused OMHC not to perform under the Merger Agreement [] because of a perceived increased risk to [himself and Davis], not to AHP or OMHC." (Doc. No. 117 at 40). S. Jacobson was not discharging his duties as an AHP director when he allegedly caused OMHC not to merge with AHP. AHP has not shown that such unaffiliated actions can serve as the basis for a breach of fiduciary duty under North Carolina law.

AHP's other bases for its breach of fiduciary duty claim also fail. (Doc. No. 5-1 at 4-5). S. Jacobson's use of AHP's confidential information was sanctioned under the Distribution Agreement. His alleged diversion of AHP corporate opportunities, employees, or comissions to Olympus either came after his resignation from AHP or was specifically sanctioned by AHP in anticipation of the companies' intended merger. (Doc. No. 117 at 45). While AHP's failure to disclose theory is more fully addressed under the section below dealing with its fraud claim, it

suffices to say that AHP has failed to present evidence that S. Jacobson knew the facts he is alleged to have suppressed. (Doc. Nos. 112-5 at 49; 112-4 at 114-15). AHP's wiretapping and unauthorized computer use allegations are also unfounded. There is no evidence that S. Jacobson violated these laws when he asked his attorney to sit in on an AHP board meeting to "field questions." (Doc. No. 112-3 at 55). AHP's "First Claim for Relief," (Doc. No. 5-1 at 4), is **DISMISSED**.

<div style="margin-left: 2em;">

2.     Olympus's Breach of the Distribution Agreement, LOI, and Non-Disclosure Agreement

</div>

AHP has failed to provide any evidence that Olympus breached either the LOI or the NDA. The LOI expressly provided that it "does not constitute a binding agreement" and was "[s]ubject to the negotiation of definitive agreements meeting with approval of the parties." (Doc. No. 107-17 at 1). Thus, Olympus cannot have breached it.

AHP has failed to direct the Court's attention to an actual Non-Disclosure Agreement. The LOI recites that the parties have executed a non-disclosure agreement, but neither party has shown it to the Court. AHP has not presented any evidence of what its terms were or how Olympus violated them. Thus, AHP has failed to show that Olympus breached a non-disclosure agreement.

AHP alleges that Olympus breached the Distribution Agreement in at least seven ways. (Doc. No. 5-1 at 6). Whether those claims may proceed depends upon when Olympus allegedly committed the breaches. The undisputed facts show that AHP materially breached this contract when it marketed its services to a competitor of Olympus. See (Doc. No. 107-9 at 7). Olympus wrote AHP on November 7, 2008 for assurances that AHP would cease such marketing and cutoff talks with the competitor. (Doc. No. 107-55). AHP refused to respond and instead

directed Olympus to communicate only with AHP's new trial counsel. (Doc. No. 107-56). This amounted to a material breach under North Carolina law. See Wilson v. Wilson, 261 N.C. 40, 43 (1964); see also (Doc. No. 107-9 at 8) (providing that North Carolina law governs the Distribution Agreement). A material breach is one "going to the heart of the contract." Hardin v. KCS Int'l, Inc., 199 N.C. App. 687, 705 (2009). The North Carolina Supreme Court has held that a breach is material where the provision breached:

> is such an essential part of the bargain that the failure of it must be considered as destroying the entire contract; or where it is such an indispensable part of what both parties intended that the contract would not have been made with the covenant omitted.

Wilson, 261 N.C. at 43.

The Distribution Agreement made Olympus the "sole and exclusive distributor" of AHP's product. (Doc. No. 107-9 at 2). The agreement further barred AHP from marketing its services through another international insurance company. (Id. at 7). AHP attempted to terminate the Distribution Agreement on October 23, 2008. (Doc. No. 107-53). Then, Olympus learned that AHP was marketing its services to a competitor of Olympus. On November 7, 2008, Olympus requested assurances that AHP would not violate the Distribution Agreement so flagrantly. (Doc. No. 107-55). AHP did not respond, but instead directed Olympus to communicate only with AHP's new trial counsel. (Doc. No. 107-56). This position made further performance impossible because the parties' duties under the Distribution Agreement required close and constant communication. Olympus was entitled to believe that AHP was brazenly violating two central provisions of the Distribution Agreement. This breach was material because the purpose of the Distribution Agreement was for Olympus to serve as the exclusive distributor. AHP distributing its service through a competitor ignored "an

indispensable part" of the Distribution Agreement and "destroyed the entire contract." <u>See</u> <u>Wilson</u>, 261 N.C. at 43.

AHP's material breach excused Olympus from further performance of the Distribution Agreement. <u>See</u> <u>Allison v. Davidson</u>, No. COA11-217, 2011 WL 6036140, at *3 (N.C. Ct. App. Dec. 6, 2011); <u>see also</u> <u>Lee v. Lee</u>, 93 N.C. App. 584, 588 (1989) (deciding whether a breach was material as a matter of law). Recognizing this fact, Olympus terminated the Distribution Agreement on November 24, 2008. (Doc. No. 107-1 at 50). After this date, it is not possible for Olympus to have violated the Distribution Agreement.

AHP argues that it was entitled to terminate the agreement for cause earlier because Olympus failed to achieve various objectives. While the parties dispute whether Olympus achieved these objectives, it is undisputed that AHP failed to give Olympus the 6-month cure period required by the Distribution Agreement. (Doc. No. 107-9 at 8). Thus, AHP was not entitled to terminate the agreement for Olympus's alleged failure to meet expectations. AHP has not asserted that any of Olympus's other alleged breaches were material.

Many of AHP's claims, including Olympus's alleged failure to meet performance objectives, appear to relate to the term of the contract. Olympus did not address these claims in its motion. Thus, AHP's claims that Olympus violated the Distribution Agreement prior to November 24, 2008 survive. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (holding that the movant has the "initial responsibility of informing the district court of the basis for its motion"). AHP's confidentiality and non-compete arguments, however, appear to relate to some time after this date and must be **DISMISSED**.

Those allegations in AHP's "Second Claim for Relief," (<u>Id.</u> at 5), which allege that Olympus violated the Distribution Agreement prior to November 24, 2008 survive. All other

allegations within this claim are **DISMISSED**.

### 3. OMHC's Tortious Interference with AHP's Distribution Agreement with OHCS and Prospective Economic Advantage

Although its counterclaim referred only to the Distribution Agreement, AHP redefines its tortious interference claim to relate to a breach of the Merger Agreement. (Doc. No. 117 at 42). Even if the Court accepted this belated amendment, this claim fails. As the Court found above, the Merger Agreement never came into force. OMHC, nor any other party, can be liable for inducing OHCS to breach a non-existent contract.

AHP's prospective economic advantage claim also fails. AHP admits that A. Jacobson agreed that the contracts in question should be in Olympus's name, rather than AHP's, because of the anticipated merger. (Doc. No. 117 at 45). AHP cannot show that Olympus lacked justification for this alleged "interference" when AHP agreed with the transaction. See Bassett Seamless Guttering, Inc. v. GutterGuard, LLC, 501 F. Supp. 2d 738, 743 (M.D.N.C. 2007). AHP's "Third Claim for Relief," (Doc. No. 5-1 at 7), is **DISMISSED**.

### 4. Olympus's Breach of the Covenant of Good Faith Implied in the LOI, NDA, and Merger Agreement

As the Court has described above, AHP has failed to prove that any of that any of these agreements were binding and valid. Thus, AHP has failed to present evidence that Olympus breached them in any way. AHP's "Fourth Claim for Relief," (Doc. No. 5-1 at 8), is **DISMISSED**.

### 5. Olympus's Misappropriation of AHP's Trade Secrets

Olympus, S. Jacobson, and Davis argue that AHP's trade secret claim should be dismissed because A. Jacobson "could not point to a single category of information that AHP considered to be a trade secret." (Doc. No. 107 at 39). Contrary to their argument, however, A.

Jacobson claimed that Olympus impermissibly used AHP's "contract templates," "marketing materials," "product designs," "provided services," and "financials." (Doc. No. 107-16 at 12). Olympus, S. Jacobson, and Davis did not address whether these items qualify under North Carolina's Trade Secrets Protection Act. Instead, they claim that AHP has merely listed broad categories of trade secrets and argue that this is insufficient to withstand summary judgment. (Doc. No. 120 at 15) (citing Stephenson v. Langdon, No. COA09-1494, 2010 WL 3469458 (N.C. Ct. App. Sept. 7, 2010). But in Stephenson, the court held that a plaintiff must "identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating." 2010 WL 3469458, at *5. AHP has done that. AHP's "Fifth Claim for Relief," (Doc. No. 5-1 at 9-10), survives summary judgment.

6.      Olympus, S. Jacobson, and Davis's Unfair and Deceptive Trade Practices

Olympus, S. Jacobson, and Davis argue that AHP's unfair and deceptive trade practices claim fails because such a claim cannot be based on a breach of contract or a securities transaction. (Doc. No. 107 at 41-42). AHP contends that its claim can be based on a breach of contract when aggravating factors are present. (Doc. No. 117 at 48) (citing Process Components, Inc. v. Baltimore Aircoil Co., 89 N.C. App. 649, 653-54 (1988) (misrepresentation in contract negotiation sufficient to sustain unfair and deceptive practices claim)). AHP also argues that the facts supporting, inter alia, its breach of fiduciary duty and trade secrets claims can support its unfair and deceptive trade practices claim. (Doc. No. 117 at 48-49). Olympus, S. Jacobson, and Davis did not address this argument. See Celotex, 477 U.S. at 323. The Court is not aware of any precedent precluding an unfair and deceptive trade practices claim based on these allegations. Olympus, S. Jacobson, and Davis's motion is **DENIED** on this point. AHP's "Sixth Claim for Relief," (Doc. No. 5-1 at 11-12), survives.

20

7.    Olympus, S. Jacobson, and Davis's Fraud

AHP alleges that Olympus, S. Jacobson, and Davis defrauded it by promising to merge their companies, while secretly intending to never complete the transaction.  (Doc. No. 117 at 49) (citing Leftwich v. Gaines, 134 N.C. App. 502, 508 (1999)).  In Leftwich, the North Carolina Court of Appeals found that "[a]s a general rule, a mere promissory representation will not be sufficient to support an action for fraud.  A promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply."  134 N.C. App. at 508.  Likewise, "the general rule that no one is liable for an expression of opinion is not a hard and fast rule; it does not apply to the dishonest expression of an opinion not actually entertained."  Id.

AHP bases their claim on "emphatic assurances" S. Jacobson gave AHP that Occitan would not impound Olympus's stock and that such an event would not be an impediment to closing the Merger Agreement.  (Doc. No. 117 at 50).  But AHP has failed to present any evidence that S. Jacobson had a contrary intent or opinion.  AHP cites passages from S. Jacobson's and his attorney's depositions.  (Id. at 50-51).  In these excerpts, S. Jacobson stated that he "wholeheartedly" believed that Occitan would never want Olympus's stock because Occitan was trying to divest itself of stock.  (Doc. No. 112-5 at 49).  In another, S. Jacobson's lawyer asked him if he was concerned about Occitan taking Olympus's stock.  S. Jacobson responded that he "did not think that was a risk because the reason Occitan sold its shares in 2005 was because [Occitan's president] had tax issues in the United States. . . . Further, [S. Jacobson] told [his attorney] that [Olympus] had never escrowed the shares and he believed Occitan knew that and never insisted that [Olympus] escrow them."  (Doc. No. 112-4 at 114-15).

AHP's fraud claim fails without any proof that S. Jacobson intended to prevent a merger

all along or had a contrary opinion to the one he gave AHP concerning Occitan. AHP's "Seventh Claim for Relief," (Doc. No. 5-1 at 12), is **DISMISSED**.

8.    S. Jacobson's Constructive Fraud

AHP alleges that S. Jacobson committed constructive fraud by making misrepresentations, concealing material facts, and usurping AHP's business opportunities and intangible assets. (Doc. No. 5-1 at 13). A party must present evidence of three elements to sustain a cause of action for constructive fraud: "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." White v. Consol. Planning, Inc., 166 N.C. App. 283, 294 (2004). S. Jacobson owed AHP a fiduciary duty in the discharge of his responsibilities as a board member, but AHP has failed to present evidence that he took advantage of this position.

AHP claims that S. Jacobson took advantage of his position to procure AHP's confidential information, mislead AHP, and usurp AHP's opportunities. (Doc. Nos. 5-1 at 13; 117 at 56). AHP also re-alleges that S. Jacobson failed to divulge information regarding Occitan and that he caused OMHC to walk away from the merger and improperly compete with AHP. (Doc. No. 117 at 56).

S. Jacobson had access to AHP's alleged confidential information through his position with Olympus and its Distribution Agreement with AHP. Therefore, he did not abuse his position on the AHP board in accessing this information. It was available to him through legitimate means and Olympus's use of the information was sanctioned. As discussed above, there is no evidence that S. Jacobson misled AHP or failed to divulge any information. A. Jacobson sanctioned the redirection of certain business directly to Olympus as part of the parties' anticipated merger. S. Jacobson's activities with Olympus after his resignation from AHP were

similarly not breaches of his fiduciary duty or improper. AHP has not shown that he used any knowledge gained solely as a director to the detriment of AHP. AHP's "Eighth Claim for Relief," (Doc. No. 5-1 at 13), is **DISMISSED**.

9.    Olympus, S. Jacobson, and Davis's Civil Conspiracy

Olympus argues that AHP's civil conspiracy claim relates only to fraud. If true, AHP's conspiracy claim would be dismissed based on the Court's dismissal of AHP's fraud claim. See Strickland v. Hedrick, 194 N.C. App. 1, 19 (2008) (holding that where summary judgment is granted on the underlying tort claims, a conspiracy claim must also fail). AHP argues that its conspiracy claim could also be based on S. Jacobson and Davis conspiring to protect their personal interests. (Doc. No. 117 at 53). AHP does not explain how Davis acting to protect his interests would be unlawful. AHP argues that S. Jacobson doing so, however, breached his fiduciary duty to AHP. The Court has already discussed this argument above. There is no evidence that S. Jacobson discharged his duties as an AHP board member in a way that violated his fiduciary duty.

Even assuming AHP had sustained that burden, its conspiracy claim would still fail. This argument would require proof that Davis and S. Jacobson had an agreement for S. Jacobson to violate his duty to AHP. See Privette v. Univ. of N.C., 96 N.C. App. 124, 139 (1989). AHP has failed to produce any evidence of such an agreement. Instead, AHP contends that S. Jacobson "(and possibly Davis) intentionally instructed OMHC to breach the Merger Agreement to protect their personal interests." (Doc. No. 117 at 53). AHP supports this claim with the quote from S. Jacobson admitting to considering his own interest and an excerpt from Olympus's attorney. (Id. at 53-54). S. Jacobson's testimony does not mention Davis. Olympus's attorney testified that Occitan taking a 51% ownership position in Olympus's parent company would diminish S.

23

Jacobson and Davis's ownership percentage in Olympus. (Doc. No. 112-3 at 65). This tautology does not prove AHP's point. AHP would have to present evidence that S. Jacobson and Davis agreed that S. Jacobson should scuttle the merger between Olympus and AHP because S. Jacobson would personally be better off without the merger going through. AHP has failed to identify this proof. AHP's "Ninth Claim for Relief," (Doc. No. 5-1 at 13-14), is **DISMISSED**.

10.     Olympus's Trademark Infringement

Olympus moves for summary judgment on AHP's false designation of origin and trademark claims. (Doc. No. 107 at 46-47). The Court previously entered a preliminary injunction against Olympus on this issue, enjoining Olympus from unauthorized use of AHP's marks and requiring Olympus to make reasonable efforts to inform its customers that they should no longer use AHP's marks. (Doc. No. 27 at 9). Olympus contends that the undisputed evidence shows that Olympus removed all AHP marks from its website by December 9, 2008. (Doc. No. 107 at 46). AHP points out that December 9 is weeks after Olympus lost its privilege to use the marks by virtue of the Distribution Agreement's November 24, 2008 termination. (Doc. No. 117 at 57); see also (Doc. No. 107-1 at 50) (Olympus's termination letter). AHP claims that Olympus used the marks well into 2009, but it presents no evidence to support this claim to the Court. (Doc. No. 117 at 57 n.19) (citing only an undisclosed portion of discovery materials).

The Court finds that the record indicates that Olympus used AHP's marks for 15 days after terminating the Distribution Agreement that entitled Olympus to use the marks. Both Federal and State law provide a remedy where "such use is likely to cause confusion." 15 U.S.C. § 1114(1) ("or to cause mistake, or to deceive"); N.C. Gen. Stat. § 80-11 ("or mistake or to deceive as to the source of origin of such goods or services"). But where such evidence of

confusion is de minimis, the plaintiff is entitled to no relief.  George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 398 (4th Cir. 2009).  AHP presents no evidence that any customers were confused over Olympus's use of AHP's marks during this brief two week period following the parties acrimonious split.  There is no evidence that Olympus continued to use the marks with an intent to deceive.  Instead, Olympus took two weeks to untie its bonds with its longtime partner.  Any infringement during this time was de minimis.  AHP's Eleventh and Thirteenth Claims for Relief, (Doc. No. 5-1 at 14, 16-17), are **DISMISSED**.

## IV.    CONCLUSION

Because the Merger Agreement never became a binding contract, Olympus is entitled to summary judgment on its claim for $160,000 in principal, $16,000 in late fees, plus interest and attorney's fees.  No final judgment shall issue at this time pursuant to Federal Rule of Civil Procedure 54(b).  AHP's claims that Olympus violated the Distribution Agreement prior to November 24, 2008 survive.  AHP's confidentiality and non-compete arguments and any other claims involving breaches which allegedly occurred after this date are **DISMISSED**.

AHP's fiduciary duty claim fails because AHP did not present evidence that S. Jacobson took any improper actions while discharging his duties as a board member.  AHP's interference claims fail because the Merger Agreement never came into force and AHP agreed to the other alleged interference.  AHP's good faith covenant claims fail because none of the contracts AHP contends were breached were enforceable.  AHP's fraud claim fails because AHP did not provide any evidence of intent.  AHP's conspiracy claim fails because AHP could not sustain its fraud or fiduciary duty claims.  AHP's constructive fraud claim fails because it failed to show that S. Jacobson abused his position on the AHP board.  AHP's trademark claims fail because AHP did not present evidence of confusion, mistake, or deception.  But AHP's trade secret,

unfair and deceptive trade practice, unjust enrichment, and quiet title claims survive because

Olympus did not sufficiently address AHP's contentions.


**IT IS, THEREFORE, ORDERED** that:

1.     Olympus's Motion for Summary Judgment on its claim for $160,000 in principal, $16,000 in late fees, plus interest and attorney's fees,  (Doc. No. 108), is **GRANTED**.  No final judgment shall issue at this time pursuant to Federal Rule of Civil Procedure 54(b);

2.     AHP's Motion for Partial Summary Judgment, (Doc. No. 110), is **DENIED**;

3.     Olympus, Davis, and S. Jacobson's Motions for Summary Judgment on AHP's counterclaims, (Doc. Nos. 106; 109), are **GRANTED IN PART and DENIED IN PART**;

    a.     AHP's "First Claim for Relief," (Doc. No. 5-1 at 4), is **DISMISSED**;

    b.     Those allegations in AHP's "Second Claim for Relief," (Id. at 5), which allege that Olympus violated the Distribution Agreement prior to November 24, 2008 survive.  All other allegations within this claim are **DISMISSED**;

    c.     AHP's "Third Claim for Relief," (Id. at 7), is **DISMISSED**;

    d.     AHP's "Fourth Claim for Relief," (Id. at 8), is **DISMISSED**;

    e.     AHP's "Fifth Claim for Relief," (Doc. No. 5-1 at 9-10), survives;

    f.     AHP's "Sixth Claim for Relief," (Doc. No. 5-1 at 11-12), survives;

    g.     AHP's "Seventh Claim for Relief," (Doc. No. 5-1 at 12), is **DISMISSED**;

    h.     AHP's "Eighth Claim for Relief," (Doc. No. 5-1 at 13), is **DISMISSED**;

i.      AHP's "Ninth Claim for Relief," (Doc. No. 5-1 at 13-14), is

**DISMISSED**;

j.      AHP's Tenth and Twelfth Claims for Relief, (Doc. No. 5-1 at 14, 15),

survive; and

k.      AHP's Eleventh and Thirteenth Claims for Relief, (Doc. No. 5-1 at 14, 16-

17), are **DISMISSED**.

Signed: February 21, 2012

Robert J. Conrad, Jr.
Chief United States District Judge